IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KATHERINE COOPER,                  )
                                   )
                    Plaintiff,     )        Civil Case No. 06-508-KI
                                   )
        vs.                        )        OPINION AND ORDER
                                   )
T-MOBILE USA, INC.,                )
                                   )
                    Defendant.     )
                                   )
———————————————————               )


        William D. Stark
        876 Welcome Way, S.E., Suite 200
        Salem, Oregon  97302

              Attorney for Plaintiff

        James Severson
        Bingham McCutchen LLP
        Three Embarcadero Center
        San Francisco, California  94111

-and-


Page 1 - OPINION AND ORDER

Paul Buchanan
Dennis E. Westlind
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

      Attorneys for Defendant


KING, Judge:

Plaintiff Katharine Cooper brings a Family Medical Leave Act ("FMLA") claim and a common law wrongful discharge claim against defendant T-Mobile USA Inc.  Before the court is defendant's Motion for Summary Judgment (#35).

## OBJECTIONS TO THE EVIDENCE

Defendant has a number of objections to the evidence offered by Cooper in opposition to defendant's motion.  Specifically, defendant objects to the affidavit of Misty Sherman dated August 8, 2005, to declarations filed in a case decided earlier this year, Sherman v. T-Mobile, No. CV 06-608-KI, and to the May 17, 2007 affidavit of Cooper herself.  Defendant also objects to a number of exhibits, mostly on the basis of relevancy, hearsay, authenticity, and abuse of the summary judgment process.  Finally, defendant objects to Cooper's counsel's failure to provide any citations to the record in support of Walker's responses to defendant's concise statement of material facts ("CSMF").

I rule specifically on the following objections raised by defendant:

(1) Cooper's May 17, 2007Affidavit[1]:  Defendant objects to all seven paragraphs of Cooper's Affidavit, asserting that they contain irrelevant statements, some of which lack

---

[1]Cooper submitted another affidavit, dated August 7, 2007, that she originally submitted in Walker v. T-Mobile, but to the extent it targets the issues in Walker's case I will disregard it.

foundation, are hearsay, and contradict prior deposition testimony. To the extent Cooper's statements are relevant, I have considered them below. As for the statements in paragraph 7 that defendant contends contradicts deposition testimony, to the extent I find a contradiction, I will rely on the more specific deposition testimony.

(2) 2002 and 2003 Performance Reviews: In response to defendant's objections, I find these reviews to be relevant. Cooper has resolved T-Mobile's objection to the 2002 Performance Review on the basis of authenticity.

(3) Exhibits 10, 11, 14, and 15: Cooper has resolved defendant's authentication objections.

(4) Exhibits 23 and 24: To the extent these documents refer to events that occurred after defendant terminated Cooper's employment, I do not consider their contents.

I find it unnecessary to rule specifically on defendant's remaining objections. I do take note, however, of defendant's argument that plaintiff abused the summary judgment process in submitting evidence that is cited nowhere in her moving papers and, as Local Rule 56.1(e) absolves me of any independent duty "to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties," I have reviewed these materials only where feasible.

As for Cooper's response to defendant's CSMF, I agree with defendant that Cooper's counsel failed to follow Local Rule 56.1(c). Rule 56.1(c) makes it clear that a party must cite to affidavits, depositions, or other documents with page numbers and line numbers in support of "the party's statement, **acceptance, or denial** of the material fact." L.R. 56.1(c)(1) (emphasis added). Cooper failed to follow this rule consistently; she provided some citations to the record

but neglected to cite support for other statements. As I have indicated to counsel before, I expect counsel to follow all the rules of civil procedure, including the local rules. Nevertheless, as I indicate above, I will review the depositions and declarations to determine what the facts are to the extent feasible.

## BACKGROUND

Cooper was hired as a customer care representative in February of 2000. Defendant promoted Cooper to a supervisor/coach in August of 2000, a position requiring her to supervise customer care representatives. As part of her supervisor duties, she responded to representatives' questions when they raised their hands during customer calls, and dealt with "escalated calls." Cooper was also expected to monitor her representatives' calls, either in side-by-side monitoring, or by randomly choosing a recorded call, and to coach them on how to provide better customer service. She was also required to accomplish a number of administrative tasks, such as approving time sheets, processing adjustments, and reviewing representatives' performance. Cooper supervised between 15 and 17 representatives.

In early 2002, Sandra Pryor served as Cooper's manager. In January, Pryor approached Cooper about her work performance, counseling her about time efficiency and meeting commitments as well as needed improvements in communication and coaching skills. Pryor counseled Cooper in February about complaints Pryor had received from Cooper's representatives, and suggested that she put together an action plan to improve her performance. Pryor outlined the items Cooper needed to work on. Pryor issued Cooper a documented verbal warning on February 26, 2002.

Cooper switched teams in April 2002, and obtained a new manager, Marty Lawhorn.  On April 18, 2002, Lawhorn gave Cooper a written warning for missing deadlines.

In April of 2003, Cooper received her evaluation for 2002.  Holly Hammons described Cooper as the "consumate [sic] team player," and "supportive of her peers," with "impressive improvement in her performance" from 2001.  Hammons also noted that "Katherine is a joy to work with and I know I am not alone when I say that I look forward to the possibility of working with her in the future."  Exhibits to Decls., Affs., Exhibits for Kathy Cooper, Part A, Ex. 1.

In the summer of 2003, Cooper experienced complications from a root canal surgery,[2] and she requested and was granted a continuous medical leave from August 7, 2003 to October 23, 2003.  She voluntarily returned to work on September 23, 2003 because she needed the money.  Charity Knight was her manager at the time.

In October 2003, Lucas Hoppe became Cooper's manager.  Cooper requested and was granted leave for occasional treatments through December 2003, which her doctor certified.

Cooper testified that during this time, "I was on an intermittent leave."  Cooper Dep. 53:19-21.  She states, however, that she was confused about how long she was on intermittent leave and that she "wasn't getting any clear answers from HR on that."  Id. 53:22-25.  She states, "The time that I was taking from work was as little as possible.  I know that my doctor's orders was to take what I needed and I was – because I felt like I needed to be there for my team, I was taking as little as possible, but I took what I needed to take."  Id. 54:4-8.  She also indicates that

---

[2]She describes in her deposition that a file was left in her root, and she experienced an allergic reaction to the metal foreign object.  She became fatigued and experienced flu-like symptoms, muscle strain, swelling in her head, pressure, and intermittent memory loss, among other symptoms.

she was "asking about whether it's calculated in hours or calculated in time and I never got specific answers in regards to that. So I just took what I needed in the morning and did what I was asked to do." Id. 54:17-21. Finally, she explains,

> Well, I was frustrated with the intermittent leave at first because I didn't know how it worked and I was trying to get information of how it worked and how much time. It was hours. And I did have somebody in HR tell me that they thought it was–they didn't know. They couldn't tell me because a supervisors never taken a leave of absence before and I thought — I'm thinking this isn't true, you know.
>
> And so I – I was trying to get more information of what do I do? How does this work? And so I felt – I felt –, I didn't feel real supported because I didn't – I wasn't getting proper information. So I was told well, just go ahead and e-mail your manager and then e-mail us. And so I did that just like a rep would.

Id. 175:13-176:1.

As compared with the normal company procedures for using intermittent leave, Hoppe demanded less from Cooper. He allowed her to simply call him to let him know when she needed time off, rather than e-mailing him and Human Resources. He also let her take full and partial days off for her condition into January, without requiring any further certifications from her doctor for the absences. Cooper estimates that between September 2003 and January 2004, she missed 30 minutes to 2 hours in the morning once a week. Her shift changed in February, so she did not need to miss work for her appointments. Cooper remembers only one time when Hoppe asked her about her leave, and that was when he asked when she would be returning to work that day. Nevertheless, Cooper felt that she was being "intensely supervised" by Hoppe from the time she returned from her continuous leave of absence. Cooper Dep. 100:18.

After receiving a complaint about Cooper's leadership, Hoppe met with Cooper's representatives on November 26, 2003 to discuss Cooper's performance with them. He followed up with Cooper afterwards, counseling her about some necessary improvements.

On December 5, 2003, Hoppe gave Cooper a written action plan for improving her performance. Later that day, one of Cooper's representatives complained to Hoppe about Cooper's failure to respond to a request for help, and Hoppe immediately counseled Cooper about the incident.

Representatives complained about Cooper to Hoppe on December 8 and 10, 2003, and on December 12, another coach told Hoppe that Cooper was not helping her representatives. That day, Hoppe counseled Cooper about the complaints and warned her that corrective action would be forthcoming if she failed to improve.

Cooper maintains that her 2003 evaluation (described in more detail below) is the sole reliable source from which to gain insight into her performance–it was above average and resulted in a merit pay increase.

On January 30, 2004, Hoppe gave Cooper a documented verbal warning for performance issues. The verbal warning noted the problems Cooper's team had in reaching Quality and Customer Response Times the past three months. It discussed Hoppe's meetings with Cooper's team and with Cooper, and described Cooper's continued performance problems, such as missing meetings, and a representative's complaint about getting incorrect information from Cooper. Hoppe shared his expectation that Cooper "improve her performance immediately," and that she set up a weekly meeting with him to ensure his expectations were met.

Cooper received a bonus of $1,095.09 on January 30, 2004. The Bonus Payment Notice explains that 70% of the bonus potential is based on individual/department performance and 30% is based on company performance. It also states, "Thank you for your ongoing commitment and contributions to the continued success of T-Mobile." Exhibits to Decls., Affs., Exhibits for Kathy Cooper, Part A, Ex. 10.

Hoppe gave Cooper her 2003 Performance Review. There is no date on the performance review, but in his calendar notes, on March 10, 2004, Hoppe states that he "presented Kathy with her annual review for 2003. Kathy accepted the annual review with no questions or concerns." Exhibits to Decls., Affs., Exhibits for Kathy Cooper, Part A, Ex. 17. In the Performance Review, Hoppe gave Cooper an overall assessment rating of 3.44, out of 5. In her self-assessment, Cooper noted that she dealt with a leave of absence and was faced with a challenging team. Hoppe wrote, "Kathy had success in 2003 even with some struggles. Some of those struggles include being on a leave, dealing with flag conditions and also getting a challenged team in the last shift bid. Kathy did see success during the year by effectively maintaining an above average rating in 4 out of the 5 metrics. This shows Kathy's commitment to making T-Mobile a leader in customer service and I wish her success in 2004." Id., Ex. 8. Her scores were poorest in the "Managerial and Functional Skills" (2.5), where Hoppe suggested she needed to "communicate a little more effectively," and "Leaders Coach and Develop Leaders" (2.8), where Hoppe commented that her feedback is "perceived as not being supportive." Id. Hoppe's overall comments were that Cooper "had a solid year with her team's performance. Kathy faced some obstacles during the year that she is working to overcome. Kathy needs to stay focused on coaching and her success will continue in 2004." Id.

On March 11, 2004, one day after giving her the above review (which covered the 2003 calendar year), Hoppe issued Cooper a written warning for performance issues. Cooper was warned about her failure to improve her quality score in February, and her Customer Response Time was 15 seconds away from the goal. She had failed to provide success plans that Hoppe had requested, she had logged in as one of her representatives on a couple of occasions (which Cooper says she did not do intentionally), and Hoppe had to correct Cooper's annual reviews for her representatives for spelling and grammatical errors. She did not meet coaching goals since she completed only 19 of 60 quality assurance monitors.

Relying on her exhibits 11 and 14, Cooper asserts that her performance measures demonstrate that her performance was better than Hoppe claimed in the written warning. Relying on her exhibit 16, Cooper claims her performance improved from 2003 to 2004.

On March 17, 2004, the Senior Manager at the Salem Call Center sent an e-mail to the entire Salem call center thanking them for performing well.

Later that month, Cooper switched managers and began working with Andre Orso. On March 30, Orso met with Cooper in a one-on-one meeting and warned her that some performance measures were not being met. In early April 2004, Cooper's team had missed two follow-ups with customers. On April 7, one of Cooper's representatives complained to Orso about Cooper. The representative felt that Cooper was too hard on her when the representative needed to leave work to care for her sick child. Neither Orso nor Cooper informed the representative of her possible right under the Oregon Family Leave Act to leave work to care for a sick child.

On April 13, 2004, Orso held a meeting with Cooper's team to talk about their concerns about Cooper. Defendant asserts that Orso followed up with Cooper, but Cooper does not recall such a meeting.

On April 15, Cooper took an escalated call and refused to waive additional charges. She did not ask Orso for help, but e-mailed him after she had hung up on the customer. Cooper told Orso that the customer had used profanity, but she did not note that on the account and only indicated that the customer had been "demanding." Orso checked the account and determined that the customer was extremely valuable and counseled her to call the customer back and offer a credit. Cooper concedes that she failed to check the customer's account history before denying him credit, contrary to policy.

On April 16, one of Cooper's representatives told Orso that Cooper had questioned her about feedback the representative had given Orso about Cooper. The representative felt that she was being retaliated against by Cooper for giving honest feedback to Orso about Cooper.

Orso proposed Cooper's termination for poor performance. Orso conferred with Hoppe prior to submitting the termination recommendation. They discussed how Cooper continued to have problems under Orso's management such as "completion of tasks, giving coaching and treatment of team members." Hoppe Dep. 48:25-49:1. Orso drafted the request for termination, and the Call Center's General Manager Joni Keith, Orso's manager Jason Freilinger, Human Resources Manager David Officer, and Human Resources Generalist Marissa Corkern approved it. Cooper was terminated based on three final incidents: the escalated call, Cooper's questioning of a representative on April 16, and the fact that she scored a call that was dead air.

Cooper was terminated on April 23, 2004. Orso testified that Cooper was terminated for these three reasons as well as her prior performance problems and corrective action.

Finally, Cooper claims that defendant gave bonuses to managers that were tied in part to the absence rate of employees for whom the manager was responsible, and her performance review considered her ability to control her representatives' absences, despite the fact that some absences were statutorily protected. Cooper also asserts that supervisors/coaches were given different guidance about how to treat their representatives' requests for family leave, different guidance about whether to document the reason for the absences, and she felt pressured to discourage absences including those taken for OFLA-protected reasons. Finally, Cooper contends that Human Resources failed to inform her and other supervisors about how intermittent leave worked.

Defendant denies that there was ever a plan to reduce absences due to family leave, or to discourage employees from taking family leave.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

**DISCUSSION**

Cooper alleges a claim under the Family Medical Leave Act and a wrongful discharge claim.

I.      FMLA Claim

In her Complaint, Cooper alleges that T-Mobile:

[I]nterfered with and harmed plaintiff's employment by beginning a continuing pattern of unjustified intense supervision because plaintiff had used and/or was using leave under the FMLA, ending in the termination of the plaintiff on April 23, 2004.

A substantial factor in defendant T-Mobile's interference with plaintiff's employment was because she was eligible for leave under FMLA and/or asserted her rights under FMLA, contrary to FMLA statutes . . . .

Complaint, ¶¶ 13, 14.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  29 U.S.C. § 2615(a)(1).  This provision is violated "by engaging in activity that tends to chill an employee's freedom to exercise his [] rights."  Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1123 (9th Cir. 2001).  Examples of interference include denying leave, discouraging an employee from using leave, and using the taking of leave as a negative factor in employment actions.  Xin Liu v. Amway Corp., 347 F.3d 1125, 1133 (9th Cir. 2003).  Under an interference cause of action, a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor" in an employment decision.  Bachelder, 259 F.3d at 1125.

A.    <u>Heightened Supervision</u>

Cooper describes coming back from her family leave, saying, "it was definitely not completely the same when I came back. I was – things were okay on [Knight's] team when I first came back, but when I got on [Hoppe's] team, from the beginning I was very much under the microscope with [Hoppe]. And it – and then I – I went on [Orso's] team and it just kind of just slid over from there and out the door." Cooper Dep. 141:16-23. She describes Hoppe's supervision of her as intense and micromanaging, and remembers that when she first joined his team he hurt her feelings when he said he lost sleep because she and a couple of others were assigned to his team. She also remembers that when a representative complained about her taking lunch when the representative had asked for help with a question, Hoppe took her into the boardroom "just him and I and he was gritting his teeth at me saying do you want to lose your job? And I said no, I don't." Cooper Dep. 57:19-21. She gives fewer instances of times when Orso excessively supervised her, remembering only the day she was terminated and being reprimanded earlier for not being nice to her representatives about their absences. Generally, she did not feel that Orso disciplined her unfairly.

Defendant responds that Cooper fails to present any evidence supporting her belief that Hoppe's and Orso's various counseling sessions with her were due to her taking leave from August 7, 2003 to September 23, 2003, or due to her occasional absences for follow-up treatment after her return to work. Rather, Hoppe, and later Orso, met with Cooper because of complaints they received from her representatives and co-workers, and due to her team's statistical performance reflected on regular status reports.

Cooper fails to raise a material issue of fact showing that her perception of "unjustified intense supervision" was due to her leave, as opposed to her performance. The evidence shows that defendant issued Cooper verbal and written warnings as a result of specific, documented, and objective performance problems. For example, the first time Hoppe met with Cooper to counsel her on an issue occurred after Hoppe met with Cooper's representatives and learned that some were unhappy with her assistance and leadership. Hoppe counseled Cooper on December 5, 2003 after receiving a complaint, and again on December 12, 2003 after receiving complaints from representatives on December 8, 10 and 12. Later counselings and warnings had a similar genesis.

Cooper contends that defendant has cherry-picked performance issues, and that the court should focus on her performance evaluations instead. I note, however, that while the 2002 evaluation characterized Cooper's performance very favorably, Cooper was no stranger to being counseled about her performance. Indeed, in 2002, Cooper received a documented verbal warning and a written warning, prepared by two different supervisors. As for the 2003 evaluation, which covered the entire year, it is true that Hoppe gave her an above average score. He did, however, identify problems with Cooper's managerial skills (2.5 out of 5) and leadership (2.8 out of 5), the very same skills that were the subject of his meetings with her in 2003. Cooper implies in her briefing that Hoppe's counselings with her in November and December are somehow less "official" than her evaluations or are "embellished" in some way. Pl.'s Res. to D.'s Mot. for Summ. J. at 3. This is nonsense. In her deposition, while not agreeing with the substance of the comments about her performance, Cooper stated she was "sure there were a lot

of complaints" Hoppe received in his meeting with her representatives. Cooper Dep. 98:13-14. She gave no reason to believe that Hoppe did not receive these complaints.

Even setting aside the counselings and warnings in 2002 and 2003, Cooper continued to experience problems in 2004. Hoppe gave her a documented verbal warning in January 30, 2004, which noted the trouble Cooper's team had in reaching goals for Quality and Customer Response Times in the last three months, that Cooper missed meetings, and that a representative complained about getting incorrect information. Hoppe gave her a written warning on March 11, 2004 for failing to improve her Customer Response Times, for failing to give Hoppe success plans he requested from her, for logging in as one of her representatives on a few occasions, for giving Hoppe annual reviews with spelling and grammatical errors, for failing to meet coaching goals, and for failing to timely call in her coaching times to workforce management.

Cooper challenges only two of the reasons justifying the written warning. She disputes the assertion that she logged in as one of her representatives, stating that she never intentionally did so. However, the written warning does not accuse Cooper of intentionally logging in as one of her representatives. It merely identifies her action as a problem for purposes of keeping track of the hours representatives worked. She also disputes that she had trouble calling in her coaching times to workforce management, but she admits that "it was always hard to call them in on that schedule." Cooper Dep. 114:6.

Cooper also relies on exhibits 11 and 14 as evidence that her performance was better than Hoppe reported in the written warning. However, in her supplemental declaration authenticating these exhibits, she explains that she received these documents from Orso, not from Hoppe. Furthermore, she admits in her deposition that in March of 2004 "[t]here was a lot of progress to

be made in [Customer Response Time] and in Quality." Cooper Dep. 103:25-104:1. She admits that she was concerned about her Quality statistic in late March or early April of 2004, and that she went to Orso and asked him what would happen if she did not meet the goal; she was worried that she would lose her job. Id. 120:13-121:12.

In addition to challenging the various reasons defendant gave for its disciplinary measures, Cooper relies on two statements made by Hoppe, the timing of the reprimands, and the fact that the documented verbal warnings and written warnings were prepared prior to meeting with her as evidence of a connection between the heightened supervision and her taking leave.

I deal first with the statements Hoppe made. Hoppe included in the 2003 evaluation a reference to Cooper's leave, calling her absence "a struggle." Exhibits to Decls., Affs., Exhibits for Kathy Cooper, Part A, Ex. 8. Cooper herself mentioned her leave in the self-evaluation portion of the form, and Hoppe mentioned the leave among other challenges, such as being assigned a difficult team. He gave her an above average evaluation overall. The only other time Cooper could remember that Hoppe mentioned her leave was when he called her while she was getting some blood work done and asked her where she was, and whether she was coming to work. Cooper reminded him that she had told him about the absence, and he responded that he didn't think it would take all day. Cooper "got back to work as soon as I possibly could. It was a very long day for me." Cooper Dep. 65:13-15.

These comments are not sufficient to raise a material issue of fact supporting plaintiff's claim that defendant subjected her to excessive supervision because of her leave. As I set forth above, the evidence shows that defendant issued Cooper verbal and written warnings as a result of documented and objective performance problems, and Cooper could give no reason to believe

that Hoppe did not receive those complaints from Cooper's representatives. In addition, Cooper concedes that Hoppe made it easier for her to take leave; he required only that she contact him and did not require her to e-mail Human Resources as well. Indeed, even though Cooper's certification from her doctor for intermittent leave expired in December, Hoppe allowed Cooper to take additional partial and full days off in January without requiring a certification. Her shift changed in February so she did not need to miss work for her appointments.

With regard to the timing of the verbal and written warnings, Cooper points out that the day Hoppe issued her a documented verbal warning she received a bonus, 70% of which was based on individual/department performance. Additionally, the day after Hoppe gave her the above average evaluation in her 2003 annual review, Hoppe issued Cooper a written warning for performance issues. Cooper suggests that the timing is indicative of improper motive.

> Q: Did you experience anything that led you to believe that you were being subject to scrutiny because you had taken medical leave?
>
> A: Well, I did have a question when I was being put on corrective action and then I would look at my reviews and my reviews looked – they looked fine. And there was positive remarks on these reviews and my numbers were – seemed to be fine on these reviews but at the same time, I'm confused because I'm getting written up and - but I'm still getting – I'm still getting pay raises and good reviews.

Cooper Dep. 100:25-101:9.

The timing of these events could well have confused Cooper, but she has failed to raise a genuine issue of material fact demonstrating a link between any heightened supervision and her leave. Indeed, Cooper does not explain how the bonus was calculated, and whether she received it due to individual performance as opposed to department performance. Furthermore, Hoppe's

evaluation of her performance was for the year 2003, and did not account for the events in 2004 for which she was disciplined.

Finally, given that there is no evidence Hoppe fabricated the complaints he received from Cooper's representatives, the fact that Hoppe prepared the documented verbal warning and written warning prior to issuing them to Cooper is irrelevant.

In sum, Cooper fails to raise a material issue of fact supporting her theory that she was subjected to heightened supervision because of her leave. Defendant is entitled to summary judgment on this portion of Cooper's claim.

B.    Termination

Defendant argues there is no evidence that defendant terminated Cooper's employment because she took leave or inquired about leave.

Cooper claims her leave was a negative factor in the decision to terminate her, and relies on the following evidence:  the fact that after only one month with a new team and manager, it ignored its official performance indicators (the 2002 and 2003 evaluations) and terminated her (rather than demote her) despite these reviews and her experience as a supervisor; it never tracked her intermittent leave time and status; the fact that she was still receiving treatment for her condition at the time of her termination; that two other supervisors were also told they could not take intermittent leave because they were salaried employees; and defendant's history of, what she calls, hostility toward family leave.

In addition, she lists the following events that she thinks reflect poorly on defendant, and demonstrate unlawful motive:  Hoppe prepared the documented verbal and written warnings before he gave them to Cooper; David Officer, the HR manager, was present during the meetings

where Cooper was given the warnings[3]; and one of the reasons listed for termination is questionable because, in purported violation of company policy, Orso asked Cooper to call back the profane customer on whom she had hung up.[4]

Defendant is entitled to judgment on this claim as Cooper fails to raise a material issue of fact that her taking FMLA-protected leave constituted a negative factor in the decision to terminate her. Orso recommended Cooper's termination due to three final incidents: the escalated call, Cooper's questioning of a representative on April 16, and the fact that she scored a call that was dead air. Orso testified that Cooper was terminated for these three reasons as well as her prior performance problems and corrective action.

Cooper offers argument and evidence on only one of the three issues Orso listed.[5] She disputes the facts surrounding the escalated call, but her argument is not supported by the evidence. She hung up on a customer, noting in the file only that the customer had been "difficult" and not that he had been using profanity like she later told Orso, and she admitted that she failed to look at his account history before refusing to waive additional charges.

---

[3] Cooper implies that his presence could be seen by a jury as "part of a continual pattern by HR employees to 'build a case' to get rid of employees who have used and/or are eligible for family leave–especially when their actual performance evaluations do not provide a foundation for a legitimate termination." Pl.'s Response at 15.

[4] According to Cooper, a jury could conclude that Orso "should not have placed Ms. Cooper in that position, but only did so to further cover up an illegal motive." Pl.'s Response at 14.

[5] She also appears to argue that she did nothing wrong by scoring the dead air call. See Pl.'s Res. to D.'s Mot. for Summ. J. at 9-10. She does not include any statements about this issue in her CSMF and she does not cite to any evidence in her memorandum. I skimmed Cooper's and Orso's depositions but did not see any support for her argument.

Cooper does argue, however, that she was terminated for upsetting a representative who needed to leave work to care for a sick child, and who later complained to Orso about Cooper's treatment of her. Cooper told the representative that she would receive a written warning if she were absent to care for her sick child again. Orso did not tell Cooper that disciplining the representative might be a violation of the Oregon Family Leave Act. Although this April 7 complaint is not listed in Orso's termination recommendation, he did testify that he considered prior performance problems in making his recommendation. Nevertheless, Cooper's argument is not relevant to the issue of whether defendant considered **Cooper's** leave in terminating her employment. After all, Cooper's Complaint is based on her theory that she was terminated for taking leave and not because another employee sought leave.

For the reasons set forth above, Cooper's favorable 2002 and 2003 evaluations and January bonus do not throw into question the documented, objective reasons for her termination, and Cooper offers no evidence in support of her statement that Officer's involvement was an indication of Human Resources "building a case" to terminate employees who used leave. Cooper provides no evidence that defendant's decisionmakers did not subjectively believe that Cooper's performance and conduct were unsatisfactory. Furthermore, Cooper does not refer to any policy that in circumstances such as hers defendant typically demotes rather than terminates employees; as a result, she can point to no policy violation or different treatment that could be attributed to her absences.

It is true, as Cooper points out, that "close temporal proximity between two events may give rise to an inference of causal connection." Liu, 347 F.3d at 1137 (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). Here, defendant terminated Cooper

seven months after her return from her continuous leave and three months after her last use of intermittent leave. In addition, Cooper offers evidence that defendant did not support employees' need for family leave. She claims that defendant gave bonuses to managers that were dependent in part upon the absence rate of employees for whom the manager was responsible, despite the fact that some absences were statutorily protected. Cooper also asserts that supervisors/coaches were given different guidance about how to treat their representatives' requests for family leave, and different guidance about whether to document the reason for the absences. Finally, Cooper contends that she and other supervisors were not informed that intermittent leave was available to them. In short, she contends that defendant deliberately kept leave information from its employees in order to reduce absences.

Even assuming these allegations are true, they are not sufficient to raise a material issue of fact contradicting the overwhelming and well-documented reasons supporting defendant's decision to terminate Cooper's employment. Even if defendant wanted to keep absences to a minimum, and did so by keeping information about leave rights from employees, there is no evidence that they terminated Cooper in order to do so. Indeed, defendant allowed her to take all the time off she needed. As Cooper admitted in her deposition, she was on intermittent leave and she "took what [she] needed to take." Cooper Dep. 53:25. Cooper has failed to raise any genuine issue of material fact that defendant was hostile about **her** taking leave.

Defendant is entitled to summary judgment on this portion of Cooper's claim.

C. <u>Notice of Right to Intermittent Leave</u>

Cooper argues in her brief that she was told she was ineligible for intermittent leave because she was on salary. More accurately, however, she stated in her deposition that she was

not provided with the information she requested about intermittent leave, in terms of the number of hours she could use.

Defendant argues that the claim is only viable if Cooper can demonstrate that she was prejudiced by defendant's actions. Stewart v. Sears, Roebuck & Co., No. CV-04-428-HU, 2005 WL 545359, * 11 (D. Or. Mar. 7, 2005) ("plaintiff must show that the alleged failure [to give notice] caused the plaintiff some prejudice").

Defendant asserts Cooper was not prejudiced by the lack of information. Defendant gave Cooper all the time off she requested. She admits that nobody ever questioned her about the use of leave, or how many hours she was taking. Hoppe allowed her to use leave beyond the amount of time certified by her doctor. He made it easier by relieving her of the obligation of contacting Human Resources about her absences. Since she took all the time she wanted, Cooper can point to no injury she suffered from any confusion Human Resources created about how many hours she may have had remaining.

Cooper argues that defendant mischaracterized her FMLA leave as personal leave, and because it failed to assess her right to FMLA leave, it denied her a substantive right under the FMLA.

Cooper fails to show defendant deprived her of any rights under the FMLA. Even if defendant was not tracking her leave, Cooper fails to show she needed leave that she was not given, that absences were counted against her, or that she felt limited by defendant in any way about whether or when she took leave. Defendant is entitled to summary judgment on this portion of Cooper's claim.

B.     Wrongful Discharge

T-Mobile asserts that it is entitled to judgment on Cooper's wrongful discharge claim as well. Cooper's claim is as follows:

> Plaintiff was eligible for leave under Oregon's Family Leave Laws (OFLA).

> Plaintiff's discharge and process of discharge were wrongful as it is against Oregon public policy to discipline plaintiff and terminate plaintiff's employment because she had invoked her rights to utilize OFLA laws.

Complaint, ¶¶ 19, 20.

Absent a contractual, statutory, or constitutional requirement, the general rule is that an employer may discharge an employee at any time and for any reason. Babick v. Oregon Arena Corp., 333 Or. 401, 407 n.2, 40 P.3d 1059 (2002). Two exceptions exist. The first is when an employee is discharged for fulfilling an important public duty. Nees v. Hocks, 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for serving on jury duty); Delaney v. Taco Time Int'l., Inc., 297 Or. 10, 681 P.2d 114 (1984) (discharged for refusing to sign a false and arguably tortious statement). The second is when the plaintiff is discharged for exercising a job-related right that reflects an important public policy. Brown v. Transcon Lines, 284 Or. 597, 588 P.2d 1087 (1978) (discharged for filing a workers compensation claim but statutory remedy in place at the time was inadequate). The Oregon Court of Appeals has allowed a wrongful discharge claim based on retaliation for invoking OFLA rights. Yeager v. Providence Health System Oregon, 195 Or. App. 134, 142-43, 96 P.3d 862 (2004).

In a wrongful discharge claim, the employee must establish a "causal connection between a protected activity and the discharge." Estes v. Lewis and Clark College, 152 Or. App. 372,

381, 954 P.2d 792 (1998). The employee's protected activity must have been a "substantial factor" in the decision to terminate the employee. Id. In other words, the employer's wrongful purpose must have been a "'factor that made a difference'" in the discharge decision." Id. (quoting Nelson v. Emerald People's Utility Dist., 116 Or. App. 366, 373, 840 P.2d 1384 (1992), aff'd in part, rev'd in part, 318 Or. 99, 862 P.2d 1293 (1993)).

For the reasons stated above, Cooper has failed to show a causal connection between her invocation of FMLA/OFLA protected rights and her termination. Accordingly, Cooper's wrongful discharge claim fails.

## CONCLUSION

For the foregoing reasons, defendant T-Mobile's Motion for Summary Judgment (#35) is GRANTED.

IT IS SO ORDERED.

Dated this ____26th_____ day of October, 2007.


   __/s/ Garr M. King_____
   Garr M. King
   United States District Judge